Walter G. EFIRD, III, M.D.

v.

The CLINIC OF PLASTIC AND
RECONSTRUCTIVE
SURGERY, P.A.

Court of Appeals of Tennessee,
at Jackson.

April 23, 2003 Session.

Dec. 30, 2003.

Permission to Appeal Denied by
Supreme Court Aug. 30, 2004.

Oscar C. Carr, III, Memphis, Tennessee, for the appellant The Clinic of Plastic and Reconstructive Surgery, P.A.

William P. Efird, Memphis, Tennessee, for the appellee Walter G. Efird, III, M.D.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, W.S., P.J., and DAVID R. FARMER, J., joined.

This is an employment case. The plaintiff physician was an employee of the defendant plastic surgery clinic. The employer clinic opened a satellite office in a suburb, staffed by the plaintiff physician. Without the knowledge of the employer clinic, the physician began directing some of the funds collected from patients to a separate bank account. The physician also took other steps toward opening his own practice, including having insurance forms filled out so that funds went to his separate bank account rather than to the employer clinic. When the employer clinic learned of the physician's activities, it terminated his employment. The physician sued the employer clinic for the fees generated by him during his employment, and the clinic counterclaimed for fraud, breach of fiduciary duty and breach of contract. A special master was appointed to determine the amount of funds both parties had collected. The parties filed cross motions for summary judgment. The trial court granted summary judgment in the favor of the physician, finding no fraud or breach of fiduciary duty, only dissolution of their contractual relationship. The special master made further findings on the financial issues, and a judgment was entered requiring the employer clinic to pay damages to the physician. The employer clinic appeals. We reverse the trial court's grant of summary judgment to the physician. The denial of the employer clinic's motion for summary judgment is reversed in part as to the physician's breach of the duty of loyalty as an employee and as to the breach of his employment contract, and factual issues remain as to the physician's status as an officer or director and his fraudulent intent.

Plaintiff/Appellee Walter G. Efird, M.D. ("Dr. Efird"), a physician specializing in plastic surgery, joined Defendant/Appellee The Clinic of Plastic and Reconstructive Surgery ("the Clinic") as a shareholder in 1991. At this time, he signed an "Employment Contract" (the "Contract"), which was the same as the employment agreement signed by the other physicians in the Clinic. The Contract described Dr. Efird's duties as follows:

2. *EMPLOYEE'S DUTIES AND EXTENT OF SERVICES.*

(a) *General Duties.* In his professional capacity [Dr. Efird] shall have the general duty to practice the profession for which the corporation is organized and operated, specifically the practice of medicine and surgery and particularly the medical specialty area of plastic and reconstructive surgery, including evening and weekend duty, with respect to such patients or clients as contract with the [Clinic] for such professional services....

The Contract also limited Dr. Efird's ability to practice medicine outside of his employment:

(d) *Entire time.* . . . [Dr. Efird] shall not engage in any professional activities except as an Employee under this Contract, and and [sic] hereby assigns and transfers to the [Clinic] all right, interests and ownership in all existing or future contracts for professional services to be rendered by [Dr. Efird] for duration of his employment under this Contract. All fees received by [Dr. Efird] in this connection shall be turned over to the [Clinic]. . . ."

Thus, the written Contract provided that Dr. Efird would not perform plastic surgery outside his employment with the Clinic, and that the Clinic would receive all of the fees generated by Dr. Efird's performance of professional medical services while an employee of the Clinic.

The Contract also addressed Dr. Efird's compensation:

3. *COMPENSATION.* For all services rendered by [Dr. Efird] under this Contract, [Dr. Efird] shall be entitled to compensation, as follows:

(a) *Direct Compensation.* During continuation of [Dr. Efird's] performance of duties under this Contract until termination date, [the Clinic] shall pay to [Dr. Efird] basic monthly salary equal to 65% of [Dr. Efird's] "compensation base" [1] . . . which monthly salary may be changed annually by memorandum agreement attached hereto, and also bonus or bonuses determined from time to time in the sole discretion of the [Clinic's] Board of Directors, in accordance with its supplemental compensation plan. . . . The purpose of such supplemental compensation is to arrive at total compensa-

tion to [Dr. Efird] which approximates the reasonable value of his services. . . .

Therefore, under the Contract, Dr. Efird would receive a monthly salary roughly equal to sixty-five percent of the collections attributable to his current production, minus his pro rata share of expenses, calculated based on the previous year's expenses.

Also included in Dr. Efird's Contract were provisions regarding the payment of deferred compensation under some circumstances in which employment was terminated, such as by death, disability or retirement. Under Section 3(b)(i), if employment were terminated by mutual consent, upon notice or for "cause," the Contract stated: "In such event, if requested by [the Clinic], [Dr. Efird] shall continue to render services and shall be paid basic monthly salary until termination date." The Contract did not provide for deferred compensation beyond the termination date upon termination for these reasons.

The Contract further addressed termination for cause in a subsequent section:

4. *TERMINATION OF EMPLOYMENT.* Employment under this Contract shall terminate upon the basis hereinafter set forth and the "termination date" in fact has arrived, as follows:

. . . .

(f) *Termination for Cause.* Employment under this Contract may be terminated by the [Clinic] for cause, by furnishing to [Dr. Efird] written notice and the basis for such termination. "Cause" includes, although

---

**1.** Simplified, Dr. Efird's "compensation base" was defined as the net cash collections attributable to Dr. Efird's production for the month of computation minus his monthly pro rata expense allocation, determined by the ex- penses for the previous year, including his nurses' salaries, his automobile and his pro rata share of rent for offices, treatment rooms, and common areas.

not exclusive, [Dr. Efird's] failure to adhere to the terms and conditions of this Contract, revocation or suspension of [Dr. Efird's] license to practice the profession for which the [Clinic] is organized an[d] operated in the State, or [Dr. Efird's] filing of a petition of bankruptcy. Termination upon this basis is referred to as *"Termination for Cause"* and the termination date shall be the date indicated in the written notice.

Thus, apart from defining termination for cause, this provision of the Contract states only that the termination date is the date in the written notice.

When Dr. Efird initially joined the Clinic, the amount of collections he would produce was unknown, so he received a draw. After the first year, he was compensated in the same way as the other physicians with the Clinic. The compensation of the Clinic physicians, including Dr. Efird, was somewhat different from the compensation described in the Contract. The Contract provided that each physician would pay a true pro rata share of expenses, presumably meaning that each physician would pay an equal share of common expenses. In practice, however, the physicians at the Clinic paid a weighted share of the overhead, with physicians who generated more revenue paying a greater share of common expenses, based on the assumption that a physician who produced more revenue would utilize a larger proportion of overhead such as secretaries, receptionists, collection employees, and the like.

As business for the Clinic grew, it opened satellite offices in addition to the Clinic's central location in Memphis. The Clinic paid the operating expenses for these satellite locations, and revenue collected for work done in the satellite offices was sent to the Clinic's central office.

Dr. Efird's practice grew and ultimately, at Dr. Efird's request, the Clinic opened a satellite location in Collierville, an affluent suburb of Memphis. The Clinic paid for rent and a computer at the Collierville location, and Dr. Efird used supplies purchased by the Clinic and employees on the Clinic's payroll. Dr. Efird was the only Clinic physician who utilized the Collierville office.

As the revenue produced by Dr. Efird grew, so did his share of the Clinic's overhead. During his final year of employment with the Clinic, Dr. Efird was the highest revenue producer. As a result, almost half of the revenue he generated went toward the Clinic's overhead expenses. Dr. Efird chafed at paying a disproportionate share of the Clinic's expenses, and voiced his dissatisfaction to at least one other physician at the Clinic.

At some point, Dr. Efird made a definite decision to leave his employment with the Clinic and open his own practice. Dr. Efird opened separate bank accounts for the Collierville office, initially depositing $16,000 of his salary into one of the separate accounts. A portion of the revenues from the work done at the Collierville location was deposited into the separate bank accounts. In addition, Dr. Efird paid separately for extra expenses for the Collierville office, such as additional advertising and a receptionist who had previously been terminated by the Clinic.

Dr. Efird found a location for his new office; it required some construction, and he targeted January 1998 for completion of the construction and for him to move to his new location. As further preparation to open his own practice, in September 1997, Dr. Efird applied to the Internal Revenue Service for a new federal tax identification number. He then switched the identification number used by health care providers and health insurance companies to identify

him from the number used by the Clinic to his newly acquired identification number. Beginning in January 1998, when Dr. Efird's patients at the Collierville office had insurance claims, rather than filing the claims electronically per the Clinic's regular practice, he had a member of his staff print a form, white out or obliterate the Clinic's name, address and tax identification number, and replace that information with the name "Collierville Office," the Collierville address, and Dr. Efird's new tax identification number. Consequently, when his patients submitted these forms to their insurance carriers, the insurance company disbursed the money to Dr. Efird rather than to the Clinic. Dr. Efird began receiving payments for his medical services from patients, health care insurers, Medicare, and other third party payers and depositing them in one of the separate bank accounts. Meanwhile, he did not leave the Clinic and move to his new location in January 1998, as he had planned.

Although Dr. Efird had voiced to at least one other Clinic physician his dissatisfaction at paying a disproportionate share of the Clinic's overhead and his feeling that he would make more money if he opened his own practice, he did not disclose that he had made a definite decision to leave the Clinic. He did not disclose the steps taken in preparation for opening his own practice, such as opening separate bank accounts, changing his federal tax identification number, altering health benefit claim forms, and directing insurance payments and revenues to the separate bank accounts.

In mid-March 1998, the Clinic received a billing statement from one of its insurance providers, which did not include Dr. Efird's name. The Clinic contacted the insurance company about the mistake, and the insurance company informed the Clinic that Dr. Efird had requested a change of address for insurance claims and that Dr. Efird had changed his identification number. This information was given to one of the senior physicians with the Clinic, James Garnett Murphy, M.D. ("Dr. Murphy"). Concerned, Dr. Murphy confronted Dr. Efird on March 22, 1998. Dr. Efird admitted that he had changed his identification number and had changed the mailing address for payments from patients or insurance companies to the address of the Collierville satellite location. Dr. Efird indicated that he put several thousand dollars into a separate account. Dr. Murphy told Dr. Efird to speak with the Clinic's attorney, telling Dr. Efird that his actions appeared to be in violation of the employment agreement and might be construed as embezzlement or fraud. Dr. Efird told Dr. Murphy that he would speak with the Clinic's attorney, but did not do so. The Clinic continued investigating Dr. Efird's actions and learned that Dr. Efird had diverted more money and contacted more insurance providers than he had told Dr. Murphy. Consequently, the Clinic sent a letter to Dr. Efird dated March 24, 1998 stating that they were terminating Dr. Efird's employment for cause, effective the next day, March 25, 1998.

On April 2, 1998, Dr. Efird filed a lawsuit against the Clinic, seeking a temporary restraining order and an injunction preventing the Clinic from changing any of Dr. Efird's patients' insurance claim information, opening any of his mail delivered to the Clinic, or interfering with his patients' choice in selecting a physician. Dr. Efird also sought to require the Clinic to return to Dr. Efird all of the medical information for Dr. Efird's patients in the Clinic's possession and to inform his patients and any other person who inquired of his new location. Finally, he sought a money judgment for his losses and damages. Along with its Answer, the Clinic filed a counterclaim against Dr. Efird, al-

leging fraud, breach of contract, breach of fiduciary duty, conversion and defamation, and seeking injunctive relief as well as damages. The Clinic also sought to recover the money Dr. Efird had deposited in his separate bank accounts under theories of constructive trust, unjust enrichment, and restitution. Dr. Efird later filed an amended complaint, seeking money damages and alleging breach of contract because he had already paid his share of the overhead costs accrued during the time he performed medical services as an employee of the Clinic, yet had not been paid the fees collected by the Clinic for those services.

On April 13, 1998, a consent order was filed which assigned to the Clinic the fees collected for Dr. Efird's professional services up to the day his association with the Clinic ended, and assigned to Dr. Efird any fees collected after that date. The order also stated: "The issue of any sums of money, property or damages due to [Dr. Efird], by [the Clinic], or, conversely, due to [the Clinic] by [Dr. Efird], is reserved pending the outcome of an accounting." Later, on May 21, 1998, a consent order was entered designating Owen Johnson of the accounting firm Rhea & Ivy as the special master to conduct the accounting. Meanwhile, the parties took depositions and conducted other discovery.

In the course of discovery, the Clinic acknowledged that the calculation of the physicians' overhead, in order to determine their monthly salary, was not done as set forth in the Contract. In addition, some of the physicians with the Clinic were also employed as teachers or faculty members with the local medical school, and others worked in clinics at local hospitals. In Dr. Murphy's deposition, he stated that,

prior to Dr. Efird joining the Clinic, there was an understanding among the Clinic physicians that their salaries as teachers or faculty members would not go to the Clinic. This agreement also applied to the wages earned at the hospital clinics.

Discovery was taken from Dr. Efird as well. In his deposition, Dr. Efird testified about a meeting in approximately March 1997 in which he expressed to the other physicians at the Clinic his frustration at paying what he viewed as a disproportionate share of the Clinic's overhead. In approximately fall of 1997, Dr. Efird made a definite decision to leave his employment with the Clinic, and began preparations for his move. In September 1997, he leased office space which was under construction, due to be completed in January 1998. Targeting January 1998 as the time he would begin his new practice, he also took steps such as securing a new tax identification number and filling out health benefit claim forms with his name instead of the Clinic, so that fees would be paid directly to him instead of the Clinic. This was based on Dr. Efird's understanding that the typical billing cycle was approximately three months. Dr. Efird stated that he consulted his brother, William Efird, an attorney,[2] and was told that since the Clinic functioned in some ways as an association of individuals who share expenses, the fees generated by Dr. Efird's medical practice belonged to him rather than to the Clinic. Pursuant to his brother's advice, Dr. Efird began directing fees to himself instead of the Clinic. There were construction delays with Dr. Efird's new office, however, and it was not ready for him to move into in January 1998, as he had anticipated. While Dr. Efird waited for his new office to be completed, the fees for

2. Although William Efird represents Dr. Efird in this appeal, at the trial court level, Dr. Efird was represented by Tim Edwards.

his medical services that he had misdirected began to arrive; he deposited these fees into a separate bank account. None of these measures were disclosed to the other physicians with the Clinic. Dr. Efird did not want the other physicians to know that he was leaving in advance of his departure because "I felt that they would fire me if they found out I was going to leave." He believed that, if this happened, it could interrupt his income stream for a period of months, so he chose not to tell the Clinic of his actions.

While the discovery process continued, the special master had been reviewing the parties' records in an effort to track the monies collected. In November 1999, the special master issued his first report. In a cover letter to the trial court, the special master noted, "The purpose of this report is to determine the following: Amounts collected by [the Clinic] on behalf of [Dr. Efird] from March 25, 1998 through August 31, 1999. Amounts due [the Clinic], collected by [Dr. Efird] through August 31, 1999." To that effect, the special master found that, after the termination of Dr. Efird's employment, the Clinic collected $181,577.91 for services performed by Dr. Efird while employed by the Clinic. The special master also found that, while Dr. Efird was employed by the Clinic, he collected $143,318.66 for services performed during his employment. The special master found that Dr. Efird had been depositing patient and insurance company payments for services performed at the Collierville satellite location primarily into three bank accounts.

In May 2001, the Clinic moved for partial summary judgment, seeking judgment on the issue of Dr. Efird's liability, with the computation of damages to be referred to the clerk and master or to the special master. The Clinic argued that Dr. Efird's termination for cause and his

breach of fiduciary duty precluded any claim by Dr. Efird for the fees the Clinic had collected for his work after Dr. Efird's employment was terminated. Further, the Clinic argued that it was entitled to a judgment on its claims for breach of contract, and that Dr. Efird should return the salary and wages paid to him during the period of time in which he was in breach of his fiduciary duty, as well as the $143,318.66 Dr. Efird collected and failed to turn over to the Clinic. The Clinic also argued that Dr. Efird should be required to pay the expense of the special master, the Clinic's attorney's fees, and punitive damages, since Dr. Efird's actions led to those expenses.

In August 2001, Dr. Efird filed a cross motion for summary judgment, arguing that as a matter of law he was entitled to all fees collected for medical services he rendered prior to his termination. Dr. Efird defended himself from the Clinic's accusations of fraud, maintaining that from the time the Collierville satellite office opened, he had sent most, though not all, payments to the Clinic. He indicated that the arrangement for the Collierville location was different from the other satellite offices in that the Clinic did not pay 100% of the expenses of the Collierville office, and suggested in fact that the Collierville location was a completely separate operation from the Clinic. Dr. Efird indicated that the monies not sent to the Clinic merely paid the overhead expenses that were not paid by the Clinic. Dr. Efird characterized his actions in obtaining a new federal tax identification number and altering health claim benefit forms as having been done in anticipation of departing the Clinic. He termed the diversion of fees to the separate bank accounts as the "sequestration" of funds, having been done with the intent that they remain untouched until their ownership could be determined. He argued that the purpose of his lawsuit

against the Clinic, filed immediately after his termination, was to settle the issue of ownership of those fees.

Regarding the Clinic's claims of breach of fiduciary duty, Dr. Efird argued that though he was a shareholder, he was never an officer or director, and that he was not an employee but rather an independent contractor. He maintained that this precluded any claim of breach of fiduciary duty.

Having responded to the Clinic's arguments, Dr. Efird argued that this was a breach of contract case only. Noting that the Contract contained no forfeiture provision for persons terminated either for cause or for other reasons, Dr. Efird claimed that he was entitled to all fees for his work at the Clinic. He also maintained that punitive damages were not allowed for breach of contract. Based on these arguments, Dr. Efird sought all of the fees collected by the Clinic post termination under a theory of breach of contract, as well as the fees he "sequestered" while still associated with the Clinic minus the appropriate overhead obligations he accrued during that period. He also requested sanctions for alleged discovery violations and an equitable "divvying up" of residual money in the Collierville office's operational account.

The trial court rendered an oral ruling and later filed a written order granting Dr. Efird's motion for summary judgment and denying the Clinic's motion for partial summary judgment. The trial court found no disputed material issues of fact "as both parties agree by virtue of their cross motions for summary judgment." The trial judge first found that the Collierville office was an extension of the Clinic, as opposed to a separate operation, but that the money retained by Dr. Efird went to the Collierville office's overhead, and thus to the benefit of the Clinic. Therefore, the trial

court concluded: "[Dr. Efird] committed no acts of fraud, deceit, and/or breach of fiduciary duties. This is a simple breach of contract case." The trial judge stated in his oral ruling: "Now they may, based upon their employment formula, have to make some adjustments in terms of accounting. But there's a world of difference between that kind of accounting adjustment versus these facts rising to the level of fraud, and rising to the level of deceit, and they do not." The trial court found the fact that the Clinic knew Dr. Efird was operating the Collierville office to be significant:

There is no question that the other members of the [Clinic] knew of Dr. Efird's desire to go to Collierville and efforts to go to Collierville, when in fact they were beneficiaries of that. . . .

. . . .

[T]his Court did handle [the Levitino] case . . . and that was a case of outright deception, fraud, and concealment. The other partners [in that case] knew nothing about those efforts. It is very distinguishable from the case before this Court today.

Therefore, the trial court held that because the Clinic knew Dr. Efird was seeing patients in the Collierville office, his diversion of the Clinic's funds without the Clinic's knowledge was neither fraudulent nor a breach of his fiduciary duties.

The trial court found that Dr. Efird was an employee of the Clinic, as opposed to an independent contractor. The trial court held that whether Dr. Efird's termination was "for cause" or not was "insignificant," reasoning: "Dr. Efird wants to be free of them. . . . The allegation and the question really is more one of an accounting. It's really more of a dissolution at this point. Someone got asked to leave and that suited them fine . . . and now it's a matter of settling up. . . ." In the alternative, the

trial court held that even if had it not been a mutually agreed upon separation, "the Court does not find ... it was for cause as [the Clinic has] alleged a cause, for the reasons I've just said about the Collierville operation," that is, that the funds put in the separate account were used for the Collierville office expenses and the Clinic benefitted from this.

Based on the trial court's conclusion that Dr. Efird committed no fraud, breached no fiduciary duties, and was not terminated for cause, the trial court held that all of the fees collected for services performed at the Collierville location for that location would be divided by the special master according to the ordinary formula for division of fees and allocation of expenses that had been used during the course of Dr. Efird's employment. Finally, the trial court declined to award sanctions for discovery abuse against either party.

In his February 2002 report, the special master totaled the collections made by both parties of fees generated by the Collierville satellite office, both before and after Dr. Efird's termination. This total was then divided between Dr. Efird and the Clinic "according to the production formula utilized by the parties throughout the term of [Dr. Efird's] employment." Post separation collections were reduced by an "average overhead." Using this method, the special master determined that the Clinic was holding $140,251 that was due to Dr. Efird and that the Clinic further owed Dr. Efird $23,722 in prejudgment interest.

The Clinic filed exceptions and objections to the special master's report, arguing that the special master should have found that Dr. Efird was entitled to receive no monies from the Clinic following his termination date because he was terminated for cause. The Clinic argued that there was no basis for awarding Dr. Efird

prejudgment interest, and that the special master's report should have recommended that the entire cost of the special master be allocated to Dr. Efird because Dr. Efird's diversion of funds made the special master's services necessary. The Clinic also questioned $11,159 in expenses that the special master found the Clinic owed Dr. Efird, indicating that this money was for a former employee of the Clinic who, while working for Dr. Efird, also drew unemployment compensation stemming from her discharge by the Clinic.

In response, Dr. Efird asserted that the special master's determination of the amount of money owed to Dr. Efird was too low because it assessed Clinic overhead against Dr. Efird for the time period after his termination. Dr. Efird also argued that the terms of the written Employment Contract did not control because the parties' course of conduct showed that it was not followed. Finally, Dr. Efird argued for sanctions under Rule 11 of the Tennessee Rules of Civil Procedure and the allocation of the special master's fee and other fees to the Clinic as sanctions for its conduct, pursuant to Rules 53 and 54.

On June 17, 2002, the trial court entered its "Final Order." The trial court rejected the Clinic's arguments and adopted some, but not all, of Dr. Efird's arguments. The trial court adopted the finding of the special master as the amount owed Dr. Efird, except that it removed the special master's deduction for the Clinic's overhead after the termination. Thus, it found that the Clinic was holding $182,278.80 in fees belonging to Dr. Efird. In addition, the trial court awarded $38,186 in prejudgment interest. Moreover, the trial court allocated to the Clinic the majority of the fees for the special master, the court reporters, and the accountant hired by Dr. Efird for the litigation. The trial court denied Dr. Efird's motion for Rule 11 sanctions.

From that order, as well as the order granting summary judgment to Dr. Efird, the Clinic now appeals.

The Clinic appeals the trial court's findings that there was no fraud or breach of fiduciary duty, that whether Dr. Efird was terminated for cause was insignificant, that there were no genuine issues of material fact regarding Dr. Efird's motion for summary judgment, and that the Clinic should bear the costs of the special master. The Clinic also appeals the award to Dr. Efird of the fees he diverted, arguing that it was based on erroneous conclusions of law by the trial court and an incorrect interpretation of the employment contract. Dr. Efird appeals the trial court's decision to set off his award by the costs incurred by the Clinic in collecting his fees and the trial court's decision not to grant his motion for Rule 11 sanctions.

■ Summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04. The movant bears the burden of demonstrating the lack of genuine issues of material fact. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On such a motion, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences of that party, and discard all countervailing evidence. *Id.*

■ Summary judgment is not appropriate unless both the facts and the inferences drawn from the facts permit the court to reasonably reach only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). There is no presumption of correctness of a trial court's grant of summary judgment, as such a motion involves only questions of law. *Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's decision to grant summary judgment to Dr. Efird is *de novo. Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn.1997).

■ Generally, concurrent findings of fact by the special master and the trial court are conclusive and cannot be overturned on appeal. Tenn.Code Ann. § 27–1–113 (2000); *State v. Wright*, 2001 WL 1105383, at *3 (Tenn.Ct.App. Sept. 21, 2001). However, such a finding is not conclusive when "(1) it is upon an issue not properly referred to a special master; (2) it is based upon an error of law; (3) it is upon a question of law or mixed fact and law; or (4) it is not supported by any material evidence." *Mid–America Apartment Comty's, L.P. v. Country Walk Partners*, No. W2002–00032–COA–R3CV, 2002 WL 31895717, at *3 (Tenn.Ct.App. Dec.31, 2002) (citing *Staggs v. Herff Motor Co.*, 216 Tenn. 113, 390 S.W.2d 245, 251 (1965)).

In this case, the standard of review applicable to concurrent findings of fact by the special master and the trial court applies only to a narrow portion of the findings. The special master, an accountant, looked only at the flow of money. In the first report, he determined the amount of collections attributable to Dr. Efird's work being held by the Clinic and the amount put into separate bank accounts by Dr. Efird. In the second report, the special master determined what portion was due to Dr. Efird, based on assumptions from the trial court that Dr. Efird would receive compensation before and after his termination, based on fees attributable to him, calculated according to the formula utilized by the parties during his employment. The special master made no factual findings regarding allegations of fraud or breach of fiduciary duty, nor did he make any determinations on the validity of the employment contract. The special master did not examine witnesses or determine

their credibility. Therefore, the only findings deemed "conclusive" on appeal are as to the amounts of fees attributable to Dr. Efird that were collected by the parties before and after Dr. Efird's termination, and the amount of overhead.

At the outset, the trial court found from the undisputed facts that Dr. Efird was an employee of the Clinic, and not an independent contractor. Dr. Efird does not appeal this finding, and we find no error in it.

■ The trial court also found that, because the parties had filed cross-motions for summary judgment, there were no undisputed issues of material fact. In some instances, this may be the case, where parties simply draw differing conclusions from agreed-upon undisputed facts. In this case, however, the parties clearly contend that different facts are undisputed. In such a situation, the losing party may assert on appeal that there are genuine issues of material fact. *See Franklin Distrib. Co. v. Crush Inter. (U.S.A.), Inc.*, 726 S.W.2d 926, 929 (Tenn.Ct.App.1986). The Clinic here contends that Dr. Efird was an officer and director and had the accompanying fiduciary duty to the Clinic; Dr. Efird contends that he was neither an officer nor a director. The Clinic contends that Dr. Efird's actions in directing fees and insurance payments to separate accounts were done with fraudulent intent; Dr. Efird contends he had no fraudulent intent and was only "sequestering" these fees.

The trial court found as a matter of law that there was "no fraud, deceit, or breach of fiduciary duties. What you've got is a simple breach of contract case." In considering the trial court's grant of summary judgment in favor of Dr. Efird, we examine these conclusions and the contentions of the parties, in light of the evidence in the record.

■ As noted above, Dr. Efird did not appeal the trial court's determination that, based on the undisputed facts, Dr. Efird was an employee of the Clinic. There was no agreement restricting Dr. Efird's ability to compete with the Clinic upon termination of his employment, so Dr. Efird was free to leave the Clinic and establish his own medical practice, in any location. *See Knott's Wholesale Foods, Inc. v. Azbell*, No. 01A-01-9510-CH-00459, 1996 WL 697943, at *3 (Tenn.Ct.App. Dec.6, 1996). During his employment relationship with the Clinic, however, Dr. Efird had a fiduciary duty of loyalty to the Clinic. *Id.* An employee "must act solely for the benefit of the employer in matters within the scope of his employment. The employee must not engage in conduct that is adverse to the employer's interests." *Id.*

■ As noted by the trial court, there was a collective decision by the physicians at the Clinic to open a satellite location in Collierville, and an understanding that Dr. Efird would practice at that location. This was no secret. Likewise, Dr. Efird's dissatisfaction with the compensation he received from the Clinic, and the method of allocating the overhead among the physicians, was also known to the Clinic. At some point, Dr. Efird's dissatisfaction led him to decide to end his employment with the Clinic, secure another office in which to open his own medical practice, and set up a separate bank account funded initially with the compensation he received from the Clinic. He did not disclose these steps to the other physicians at the Clinic. These actions in and of themselves were not a breach of the employee's duty of loyalty, but rather were "merely preparation for postemployment competition." *Knott's*, 1996 WL 697943 at *5. Dr. Efird's actions, however, soon went well beyond mere preparation to open his

own practice. He soon began directing fees from patients to the separate bank accounts, changed the identification number used to obtain insurance payments and had claims forms altered so that these payments would go to his separate accounts rather than to the Clinic. Not surprisingly, these actions were not disclosed to the Clinic. Without question, these actions were adverse to the Clinic and a violation of the employee's fiduciary duty of loyalty.

Dr. Efird seeks to soften the duplicitous nature of his actions by noting that they were only taken after he made his decision to leave the Clinic, and that once his conduct became known and he was confronted by Dr. Murphy, he admitted at least some of it to the Clinic. Similarly, he euphemistically refers to the siphoning off of fees as the "sequestration" of fees, done pursuant to misguided legal advice. He explains that insurance payments were directed to the separate bank account because, contrary to his expectation, the construction on his new office was not completed in January 1998 so that he could make his move. No matter. Dr. Efird "was attempting to serve two masters, and by so doing he was totally wrong." *Gates, Duncan and Vancamp Co. v. Levatino*, 962 S.W.2d 21, 25 (Tenn.Ct.App.1997). As a matter of law, his actions constitute a breach of the employee's fiduciary duty of loyalty.

Dr. Efird argues, and the trial court noted, that some of the monies directed to the separate bank accounts were used to pay expenses associated with Dr. Efird's practice at the Clinic's Collierville location, such as separate advertising for Dr. Efird and pay for the employee hired by Dr. Efird who had previously been terminated

by the Clinic. Indeed, in discovery, the Clinic indicated that, had Dr. Efird approached them about the additional expenses, they might have agreed to pay at least some of them.[3] Using a type of "no harm, no foul" reasoning, Dr. Efird argues that the monies directed to the separate bank accounts were not really taken from the Clinic. This can only be characterized as sophistry. The point is that the monies belonged to the Clinic, not to Dr. Efird, and how the monies would be utilized was a decision which belonged to the Clinic, not to Dr. Efird alone. Because Dr. Efird secreted these funds to separate bank accounts, the decision on how to use them was taken from the rightful owner.

An employee who breaches the fiduciary duty of loyalty may be required to disgorge any profit or benefit he received as a result of his disloyal activities. *See ITT Cmty. Dev. Corp. v. Barton*, 457 F.Supp. 224, 230 (M.D.Fla.1978); *Clyde Rudd & Assocs., Inc. v. Taylor*, 29 N.C.App. 679, 225 S.E.2d 602, 604 (1976); Restatement (Second) of Agency § 469. In addition, an employee who breaches the duty of loyalty may be required to surrender any compensation paid by the employer during the period of breach. *Baker v. Battershell*, 1986 WL 7602, at *6 (Tenn.Ct. App. July 9, 1986) (citing *Red Boiling Water Co. v. McEwen*, 3 Tenn. C.C.A. (Higgins) 687 (Tenn.Ct.App.1913)). It is not necessary that the employer suffer a loss in order to recoup such illicit profits or compensation from the employee. *Phansalkar v. Anderson Weinroth & Co.*, 344 F.3d 184, 200 (2d. Cir.2003); *Ross v. Calamia*, 153 Fla. 151, 13 So.2d 916, 917 (1943); *Faultersack v. Clintonville Sales Corp.*, 253 Wis. 432, 34 N.W.2d 682, 684 (1948); Restatement (Second) of Agency § 469.

---

**3.** With the exception of the employee who had been previously terminated by the Clinic, since she was at the same time drawing un-

employment compensation stemming from her termination by the Clinic.

Therefore, the trial court must determine damages due the Clinic under the circumstances of this case.

■ The Clinic alleges that Dr. Efird was an officer and director of the Clinic. "It is well established that officers and directors of a corporation owe a fiduciary duty to the corporation and its members . . . and, while occupying such a position of trust, must act in the utmost good faith." *Heffernan v. Heffernan, Ballinger, Pounds and Yarbrough, Inc.,* No. 02A01–9504–CH–00080, 1996 WL 512639, at *4 (Tenn.Ct.App. Sept.11, 1996). In *Heffernan,* the corporation was an insurance agency, and Heffernan was its president. *Id.* at *1. Heffernan became dissatisfied and told the other shareholders that he would leave in several months. *Id.* Prior to his departure, however, Heffernan began directing business to his new agency. *Id.* at *2–3. Heffernan felt at the time that he had effectively ended his relationship with the corporation, and he insisted that the accounts he directed to his new agency were those that he developed prior to joining the corporation. *Id.* Nevertheless, he admitted that he was president of the corporation at the time he was directing accounts to his new agency, and that he did not tell the other shareholders of his actions. *Id.* at *2–3. His purpose was to ensure that future commissions would go to his new agency rather than to the corporation. *Id.* at *3–5. After hearing testimony, a special master concluded that Heffernan had not breached his fiduciary duty to the corporation, because the other shareholders knew that Heffernan was dissatisfied and that he was going to leave. *Id.* at *3. The master's report was affirmed by the trial court. *Id.* at *1. The appellate court held that the findings of the special master were not conclusive on appeal because they involved mixed questions of fact and law. *Id.* at *3, 5. It held on appeal

that Heffernan's actions constituted a breach of his fiduciary duty to the corporation. *Id.* at *5. The appellate court noted the general rule that "corporate officers who engage in activities which constitute a breach of their duty of loyalty . . . are not entitled to compensation for services performed during that time period even though part of their services were properly performed." *Id.* Consequently, it held that Heffernan was entitled to no compensation for the two month period of time in which he was in breach of his duty to the corporation. *Id.*

■ In this case, Dr. Efird denies that he was either an officer or a director of the Clinic. Consequently, his status in that regard appears to be a disputed fact. If it is determined that Dr. Efird was an officer or director of the Clinic during the period of time in which he was directing patient fees and insurance payments to his separate accounts, his actions would constitute a breach of his fiduciary duties, and the Clinic would be entitled to appropriate damages.

■ The Clinic also contends that Dr. Efird's diversion of funds was fraudulent. The trial court noted that the other members of the Clinic knew of Dr. Efird's practice at the Clinic's Collierville location, and that "they were beneficiaries" of the Collierville office. It found that

the money taken into this Collierville operation that was attended to exclusively by Dr. Efird, went to the overhead of that operation and it went, ultimately, to the benefit of the [Clinic].

Now they may, based upon their employment formula, have to make some adjustments in terms of accounting. But there's a world of difference between that kind of accounting adjustment versus these facts rising to the level of fraud, and rising to the level of deceit, and they do not.

As noted above, however, while the Clinic certainly knew that Dr. Efird was practicing at the Clinic's Collierville satellite location, by all accounts the other members of the Clinic did not know that Dr. Efird had made a definite decision to leave, and certainly did not know that funds from patients and from insurance companies which should have gone to the Clinic were instead being steered to Dr. Efird's separate bank accounts. Clearly this creates a factual issue as to whether Dr. Efird's actions were done with fraudulent intent. Indeed, it is rare for summary judgment to be appropriate when considering an issue of fraud. *K.C. Lam v. Allen,* No. W1999–00244–COA–R3CV, 2000 WL 705980, at *2 (Tenn.Ct.App. May 26, 2000) (citing *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn.1978); *Perryman v. Peterbilt of Knoxville, Inc.,* 708 S.W.2d 403, 405 (Tenn.Ct.App.1985)). Consequently, we must conclude that the trial court's grant of summary judgment to Dr. Efird on this issue was erroneous. Since a factual issue remains on this claim, the trial court correctly denied the Clinic's motion for summary judgment on the issue of fraud.

We next turn to the issue of breach of Dr. Efird's Employment Contract. The Clinic contends that Dr. Efird's actions were a breach of the Contract, and that, consequently, he was terminated for cause. The Clinic maintains that if Dr. Efird were terminated for cause, he would be entitled to no compensation beyond the date on which his employment was terminated. Dr. Efird initially alleged that the Clinic breached the Contract, and sought damages for the breach. Later, however, Dr. Efird took the position that the parties did not follow the Contract, and so it should be disregarded in its entirety. The trial court, after finding no fraud, deceit or breach of fiduciary duty, concluded that this was "a simple breach of contract case" in which Dr. Efird left the Clinic and the

task at hand was to sort out the monies due each party upon dissolution of the employment relationship. Consequently, the special master was instructed to determine the monies due by applying the compensation formula utilized by the Clinic during Dr. Efird's employment to all fees collected by the Clinic and by Dr. Efird, both before and after his termination, for work attributable to Dr. Efird.

Dr. Efird contends generally that the parties' "course of conduct" rendered the entire Employment Contract unenforceable. Dr. Efird points to the undisputed fact that the Clinic compensated all of the physicians, including Dr. Efird, by a formula which varied from that set forth in the Contract. In addition, Dr. Efird notes that, as admitted by the Clinic, some of the physicians received fees from teaching duties at the local medical school or from clinics performed at local hospitals, and that the Clinic physicians agreed that such fees would not go to the Clinic, but would be retained by the individual physicians.

In essence, Dr. Efird argues that, by disregarding two paragraphs of the Contract in selected instances, the Clinic waived not only these contractual provisions but the entire contract. There is a key difference, however, which is extenuated by Dr. Efird. In the instances cited by Dr. Efird against the Clinic, there was a knowing waiver of the contractual provisions by all of the affected parties; all of the physicians understood the compensation formula to be used and there was full disclosure to the Clinic of the fact that some members received outside compensation from teaching duties. In contrast, Dr. Efird's actions, in directing funds to separate accounts, altering health benefit forms and filling out payment forms with his new tax identification number rather than that of the Clinic, were unbeknownst to the

other members of the Clinic. There can be no waiver of the Contract's terms as to Dr. Efird where there was no knowledge of his conduct. *Harlan v. Hardaway*, 796 S.W.2d 953, 959 (Tenn.Ct.App.1990). Consequently, Dr. Efird cites no facts which establish a waiver of the Contract's requirements in section 2(d) that he refrain from engaging in medical practice outside the Contract, and that all fees in connection with his medical practice be turned over the Clinic. Under these circumstances, it is apparent that Dr. Efird's conduct constituted a breach of the Contract.[4]

As noted above, under section 4(f) of the Contract, "failure to adhere to the terms and conditions of this Contract" is deemed "cause" for termination of employment. The trial court held that whether Dr. Efird was terminated for cause was "insignificant." Section 3(b)(i) of the Contract states that if employment is terminated by mutual consent, upon notice, or for cause, Dr. Efird would "be paid basic monthly salary until termination date." In such instances, under section 4(f), the termination date is the date set forth in the written notice, here, March 25, 1998. The plain terms of the Contract appear to provide that Dr. Efird would be entitled to no compensation after his termination date, by virtue of accounts receivable not yet paid or otherwise. However, included in the record is evidence regarding application of the Con-

tract provisions in prior instances in which a physician's employment with the Clinic was terminated, and the course of dealing in these prior instances could reflect the parties' interpretation of the provisions regarding compensation in the event of termination. Consequently, the case must be remanded for the trial court's interpretation of the Contract in light of this evidence.[5]

The Clinic also argues on appeal that the findings of the special master, adopted as modified by the trial court, should be overturned. In this case, the special master's findings were primarily limited to determining how much was collected for Dr. Efird's work as an employee of the Clinic, where and when it was deposited, and the applicable overhead expenses. The allocation of such fees to Dr. Efird was done pursuant to the trial court's ruling on issues of law relating to the contractual relationship of the parties. As such, the special master's determination of the amount due Dr. Efird, adopted as modified by the trial court, involves mixed questions of fact and law, not conclusive on appeal. *See Heffernan*, 1996 WL 512639 at *3, 5. Consequently, in light of our holdings on appeal regarding Dr. Efird's potential liability to the Clinic for breach of the employee's duty of loyalty, breach of fiduciary duty of an officer or director, fraud and breach of contract, the determination of the amounts due Dr. Efird from the Clinic is reversed.[6]

---

4. The Clinic argues as well that Dr. Efird is judicially estopped from arguing that he is not bound by the Employment Contract, because he asserted a claim against the Clinic for breach of contract in his amended Complaint. This holding makes it unnecessary to address this argument in this appeal.

5. The holding regarding Dr. Efird's breach of his fiduciary duty of loyalty as an employee and any breach of his fiduciary duties as an officer or director, and the damages flowing

from such breach may make interpretation of these contractual provisions unnecessary.

6. This includes the special maser's allocation to the Clinic of "overhead expenses" paid by Dr. Efird out of funds diverted to his separate accounts, such as additional advertising expenses and the compensation paid by Dr. Efird to an employee who had previously been discharged by the Clinic. The Clinic raises further issues on appeal regarding differences between the calculations in the spe-

The Clinic appeals further the trial court's allocation to the Clinic of the majority of the fees of the special master, as well as discretionary costs. In light of the above holdings, this must also be reversed and remanded to the trial court for reconsideration. Clearly Dr. Efird's actions made the litigation and the appointment of the special master necessary. The trial court, however, in making its allocation, also considered the parties' conduct during the course of discovery. Consequently, we remand this issue for the trial court's reconsideration.

Dr. Efird raises two issues on appeal. He argues first that the trial court erred in holding that the Clinic was entitled to a credit of ten percent to offset its expenses in collecting the accounts receivable attributable to Dr. Efird. In light of the holdings on appeal set forth above, this issue is pretermitted.

Dr. Efird also argues that the trial court erred in declining to award sanctions against the Clinic for maintaining that Dr. Efird's Employment Contract was enforceable. In light of our holding set forth above on the enforceability of the Contract, we hold this issue to be without merit.

In sum, the trial court's grant of summary judgment in favor of Dr. Efird is reversed. The trial court's denial of the Clinic's motion for summary judgment is reversed in part and affirmed in part. The Clinic's motion for summary judgment is granted as to the issue of Dr. Efird's liability on the claim that Dr. Efird breached his duty of loyalty as an employee, and the cause is remanded for a determination of damages to the Clinic for Dr. Efird's breach. The trial court's denial of the Clinic's motion for summary judgment on the claim that Dr. Efird breached his fidu-

ciary duty as an officer or director of the Clinic is affirmed in that a genuine issue of material fact exists as to whether Dr. Efird was an officer or director of the Clinic. If it is determined on remand that Dr. Efird was an officer or director, then the Clinic is entitled to a favorable judgment as to liability for this claim, and damages to the Clinic for this breach must be determined. The trial court's finding of no fraud is reversed. The trial court's denial of the Clinic's motion for summary judgment on its claim of fraud by Dr. Efird is affirmed, since a genuine issue of fact exists as to Dr. Efird's fraudulent intent.

On the Clinic's claims of breach of contract, the trial court's denial of the Clinic's motion for summary judgment is reversed, and summary judgment is granted to the Clinic on the issue of Dr. Efird's breach of the Contract and his termination for cause. Insofar as a determination of damages is necessary, the cause is remanded for such a determination. The findings of the special master, adopted as modified by the trial court and awarding certain sums to Dr. Efird, are reversed and vacated on appeal. The assessment of the fees of the special master and discretionary costs is reversed and remanded for reconsideration in light of this Opinion. The issue raised by Dr. Efird on appeal regarding the assessment of ten percent collection costs is pretermitted by the holdings in this Opinion. The trial court's decision not to award sanctions against the Clinic for continuing to maintain that the Employment Contract was applicable to Dr. Efird is affirmed. All other issues raised on appeal are pretermitted.

The decision of the trial court is reversed in part and affirmed in part as set

cial master's draft report dated January 15, 2002, and his final report dated February 25, 2002. Our holdings on appeal make it unnecessary to address this issue.

forth above, and the cause is remanded for further proceedings not inconsistent with this Opinion. Costs on appeal are assessed against Appellee Walter F. Efird, III, M.D., for which execution may issue if necessary.