NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0248n.06

Case Nos. 21-5326/5604

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 21, 2022
DEBORAH S. HUNT, Clerk

WISCHERMANN PARTNERS, INC., et al.,

    Plaintiff-Appellees,

v.

NASHVILLE HOSPITALITY CAPITAL LLC,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

OPINION

---

Before: SILER, CLAY, and MURPHY, Circuit Judges.

SILER, Circuit Judge. This is a dispute between a hotel and its former manager. The manager sued the hotel owner for breach of contract, and the owner counterclaimed for breach of contract, breach of the implied duty of good faith and fair dealing, breach of fiduciary duty, gross negligence, and fraud. The district court held an eight-day bench trial and then found for the manager on every claim and counterclaim. But because the district court's opinion rests on legal error, we vacate its judgment and remand for further proceedings.

I

A

Kevin Fee and Seamus Ross decided to open a hotel in downtown Nashville. So they secured financing, found a suitable parcel of real estate, and selected a hotel brand: The Westin.

Then they hired Paul Wischermann, the CEO and sole shareholder of Wischermann Partners, Incorporated (WPI), to shepherd them through the early stages of hotel development.

Wischermann's company—WPI—and a limited liability company founded by Fee and Ross—Nashville Hospitality Capital LLC (NHC)—signed a consulting agreement on December 1, 2013. The agreement included a confidentiality clause but no restrictions on competition. Wischermann was therefore free, at least at this point, to advise and manage other hotels in the Nashville area.

Approximately two months later, in February 2014, Wischermann convinced another client, Joel Pizzuti, to build his own hotel in downtown Nashville. Much as he did for Fee and Ross, Wischermann advised Pizzuti through the hotel-development process. He helped secure a site for Pizzuti's new hotel: Fourth Avenue in downtown Nashville, a couple blocks from The Westin. He recommended a hotel tier and brand: a luxury brand called "The Joseph." His architect even designed the preliminary floor plans.

Then, in late 2014, WPI and NHC signed a lengthy hotel management agreement. This agreement shifted the WPI-NHC relationship from a consulting relationship, *i.e.*, one where Wischermann advised Fee and Ross on The Westin's development, to a management relationship, *i.e.*, one where Wischermann managed The Westin and oversaw its day-to-day operation.

With this new agreement came new responsibilities, among them new restrictions on competition. Unlike the earlier NHC-WPI consulting agreement, the management agreement has an expansive non-compete provision. That provision prohibits WPI and Wischermann from developing, syndicating, financing, owning, operating, or managing any hotel within a one-mile radius of The Westin Nashville unless NHC gives "prior written consent."

23.29 <u>Non-Competition.</u> Neither Manager nor any Affiliate, successor or assignee of Manager shall, without the prior written consent of Owner, develop, syndicate, finance, own, operate or manage (or grant such rights to third parties), either directly, indirectly or by any means, any other hotel within that certain geographic area described on Exhibit D attached hereto (the "Geographic Zone")[1] of the Hotel but excluding any hotel properties within such Geographic Zone currently under management by Manager.

The agreement also has a confidentiality provision. It prohibits both parties, NHC and WPI, from disclosing or misusing "confidential or proprietary information."

15.1 <u>Right to Use</u>. Neither party hereto shall use any Confidential or Proprietary Information for any purpose other than with respect to the Construction and Operation of the Hotel pursuant to this Agreement.

. . .

15.3 <u>Ownership and Non-Disclosure.</u> . . . Manager will at all times use all reasonable means to protect the confidentiality of the Confidential and Proprietary Information, use it only for the sole benefit of the Owner and the Hotel and will not communicate or make it available to, or use it for the benefit of, any unauthorized Persons.

Along with confidentiality and non-compete provisions, the management agreement has detailed rules for contract termination. Those rules empower NHC to sever its relationship with WPI in one of three ways.

First is Section 17.1, which allows NHC to terminate the management agreement without payment of a termination fee if (1) WPI "fails to perform any of [its] obligations contained in th[e] [a]greement," (2) NHC notifies WPI of the unperformed obligation(s), and (3) "such failure continues for a period of thirty (30) days" after NHC provides notice.

17.1 <u>Owner's General Default Rights</u>. Owner may terminate this Agreement by notice to Manager if Manager fails to perform any of Manager's obligations contained in this Agreement, and such failure continues for a period of thirty (30) days after notice to Manager setting out the failure in reasonable detail. If the failure is such that it cannot reasonably be cured within such thirty (30) days, Owner may not terminate this Agreement as long as Manager begins the cure within thirty

---

[1] Schedule 4 to the management agreement defines "Geographic Zone" as the area within a one-mile radius of The Westin Nashville.

(30) days and proceeds diligently and in good faith to accomplish the cure within sixty (60) days. Manager shall not be entitled to the Termination Fee if this Agreement is terminated as provided in this Section 17.1.

Next, Section 17.2 allows NHC to terminate the management agreement if WPI fails to comply either with a "material provision" of the agreement or "a sufficient number of non-material provisions which, collectively, constitute materiality or evidence a disregard for [WPI's] obligations." Like Section 17.1, Section 17.2 has a thirty-day right-to-cure provision and authorizes termination without payment of a termination fee.

> 17.2 <u>Default by Manager – Opportunity to Cure</u>. The following, without limitation, are events of material default by Manager, which entitle Owner, in addition to and cumulative of any and all rights and remedies available to Owner under this Agreement, at law or in equity, to terminate this Agreement without payment of the Termination Fee upon notice to Manager, subject to Manager's right to cure. The cure period for any default, unless stated otherwise, is thirty (30) days from the receipt of the notice.
>
> . . .
>
> (c) Failure to comply with: (i) any other material provision of this Agreement; or (ii) a sufficient number of non-material provisions which, collectively, constitute materiality or evidence a disregard for Manager's obligations under this Agreement, provided, however, if such default is such that it cannot reasonably be cured within the thirty (30) days, Owner may not terminate this Agreement as long as Manager begins the cure within thirty days and proceeds diligently and in good faith to accomplish the cure within a period not to exceed sixty (60) days.

The third avenue for termination is Section 17.3. It empowers NHC to terminate the agreement "at any time, without cause, by written notice to [WPI] . . . not less than sixty (60) days prior to the termination date." Unlike the first two options, Section 17.3 requires NHC to pay a substantial termination fee.

B

WPI and Wischermann managed The Westin for approximately two and one-half years after the management agreement's execution. They hired and supervised the hotel staff, directed hotel operations, set pricing and monthly targets, and managed licensing and compliance.

Through it all, Wischermann continued offering information and advice to Pizzuti. And his relationship with The Westin—his access to confidential and proprietary information—informed the advice he offered. By his own admission he "shared all kinds of information about The Westin with third parties," including Pizzuti and others at The Joseph. He shared information about The Westin's booking pace and pricing scheme, details about The Westin's opening budget, "schematics of the hotel, acoustic information about the hotel, junction box locations, pool stuff, pretty much anything you could imagine about the hotel being built." All this while he and his company were subject to the management agreement's confidentiality and non-compete provisions.

The parties dispute when and how Wischermann disclosed his partnership with Pizzuti to NHC. Wischermann claims he fully disclosed the partnership sometime in 2014, "right at the beginning." Fee and Ross remember things differently; they say Wischermann first admitted to working on The Joseph in February 2017, more than two years after the management agreement's execution. Differences aside, everyone agrees on two important points: first, everyone agrees The Joseph is less than one mile from The Westin, so indubitably it falls within the management agreement's non-compete provision, and second, everyone agrees Wischermann never obtained "prior written consent" to work on The Joseph.

At some point, Wischermann's association with Pizzuti began to strain his relationship with Fee and Ross. The more Fee and Ross learned about Wischermann's work on The Joseph, the more strained the relationship became. The disagreement ultimately came to a head on April 27, 2017, when NHC sent Wischermann and WPI a two-page default notice. That notice accused Wischermann of violating several "material" provisions of the management agreement, including the confidentiality and non-compete provisions. It also included the following admonition:

Please be advised that this letter constitutes thirty (30) days' written notice of Owner's right to terminate the Agreement in its entirety pursuant to Section 17.2 thereof in the event that Manager is not able to cure all such defaults on or prior to May 29, 2017. The effective date of termination . . . shall be May 29, 2017.

Wischermann responded promptly to NHC's default notice. Within thirty days of receiving the notice he (1) terminated his consulting agreement with Pizzuti and (2) directed WPI's employees to stop working on The Joseph. Wischermann's attorney communicated these curative efforts to NHC in a letter dated May 16, 2017.

NHC responded three days later. According to the response letter, WPI's efforts fell far short of curing the breaches identified in the default notice. Why? Because even if WPI had minimized the risk of future breaches of loyalty and confidentiality, it had made no effort—zero— to cure the damage done by years of disloyalty. Pizzuti still had NHC's confidential information, and The Westin still had a formidable competitor in its backyard. So NHC reiterated the management agreement would "terminate on May 29, 2017."

C

In response, WPI sued NHC in federal court for breach of contract. NHC answered and filed a series of counterclaims.

Following years of discovery and motion practice, the district court held a bench trial in October 2019. After hearing voluminous testimony from both lay and expert witnesses, the district court found for WPI across the board. *See Wischermann Partners. Inc. v. Nashville Hosp. Cap. LLC*, No. 17-cv-849, 2021 WL 809683 (M.D. Tenn. Mar. 3, 2021). According to the court's findings of fact and conclusions of law, NHC breached the management agreement by failing to comply with the termination procedures set out in Sections 17.1, 17.2, and 17.3. *Id.* at \*4–6. The district court also found that NHC failed to prove an essential element of every counterclaim. Five of its counterclaims—breach of contract, breach of fiduciary duty, fraudulent concealment,

fraudulent inducement, and fraudulent misrepresentation—failed because Wischermann and WPI did not proximately cause NHC to suffer financial damages. *Id.* at *7–9. Its other counterclaim, gross negligence, failed under the duty element. *Id.* at *7. In the end the district court ordered NHC to pay $1,658,044, or the full fee required for termination under Section 17.3.

On appeal, NHC challenges two of the district court's conclusions. First, it disagrees with the district court's breach-of-fiduciary-duty analysis. Second, it disagrees with how the district court resolved WPI's claim for breach of contract.

## II

We begin with NHC's counterclaim for breach of fiduciary duty.[2] A party claiming breach of fiduciary duty must show "(1) the existence of a fiduciary duty (2) that was breached (3) proximately causing damages." *Pagliara v. Johnston Barton Proctor & Rose, LLP*, 708 F.3d 813, 818 (6th Cir. 2013) (citing 23 Tennessee Practice Series: Elements of an Action § 8.1 (2009–2010)).

The district court's decision rested exclusively on element three. It offered the following analysis:

> Even assuming NHC established the first and second elements of its breach of fiduciary duty claim, it has not demonstrated that its anticipated future loss of . . . net income resulted from WPI's or Wischermann's disloyal conduct in and before 2017. . . . Pizzuti would have developed a luxury hotel with or without WPI. While the Joseph may impact the Westin's revenues, NHC has not demonstrated that, more likely than not, WPI's or Wischerman's conduct is the "but for" cause of that impact.

*Wischermann Partners, Inc.*, 2021 WL 809683, at *7. In short, Wischermann did not proximately cause The Westin to suffer a direct financial loss because Pizzuti would have developed a luxury

---

[2] This appeal follows a bench trial, so we review the district court's factual findings for clear error and its legal conclusions de novo. *Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020). Consistent with the management agreement's choice-of-law clause, our analysis applies the substantive law of Tennessee.

hotel in downtown Nashville "with or without WPI." So even if WPI and Wischermann owed a fiduciary duty to NHC, and even if they breached that duty by selling expertise and confidential information to Pizzuti, NHC cannot satisfy the third breach-of-fiduciary-duty element.

We disagree. Assuming the district court's factual finding is correct—assuming, in other words, that Wischermann did not cause The Westin to suffer a direct financial loss—this fact does not foreclose a claim for breach of fiduciary duty. Another source of potential damages remains. NHC claims it "paid WPI $2,289,046.27 in fees and disbursements during the period WPI and Wischermann" breached their fiduciary duties. If true, these fees and disbursements may represent a recoverable source of damages. Tennessee courts have explained, after all, that "an employee who breaches the duty of loyalty may be required to surrender any compensation paid by the employer during the period of breach." *Elfird v. Clinic of Plastic & Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 220 (Tenn. Ct. App. 2003) (citing *Baker v. Battershell*, 1986 WL 7602, at *6 (Tenn. Ct. App. July 9, 1986)); *see also Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn. 1983) ("Misconduct in violation of a statute or acts against public policy, or in breach of an attorney's fiduciary duty to his client, may support a complete forfeiture of fees."); *cf.* Restatement (Third) of Agency § 8.01, cmt. d(2) (Am. Law Inst. 2006) ("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty."). And these fees "may be" recoverable whether or not the breaching conduct caused the party to which a fiduciary duty is owed to experience a direct pecuniary loss. *Elfird*, 147 S.W.3d at 220.

NHC requested forfeiture in its briefing before the district court, yet the district court never considered whether forfeiture is an appropriate remedy in this case.[3] We therefore will remand NHC's counterclaim for reconsideration. We express no view on the first two breach-of-fiduciary-duty elements. These elements often involve difficult questions of fact, *see, e.g.*, *In re Est. of Brevard*, 213 S.W.3d 298, 303 (Tenn. Ct. App. 2006) (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 385–86 (Tenn. 1995)), and we leave those questions for the trier of fact to answer in the first instance.

On remand the district court should evaluate whether Wischermann and WPI owed NHC a fiduciary duty; if so, whether they breached their duty; and, if affirmative, whether forfeiture is an appropriate remedy. It may also consider whether a full forfeiture is required or whether a lesser amount is appropriate. *Cf. Wall Sys., Inc. v. Pompa*, 154 A.3d 989, 999–1002 (Conn. 2017).

III

A

Now we turn to WPI's breach-of-contract claim. The district court found that NHC breached its contract with WPI when it terminated the management agreement without payment of a termination fee. This finding rests on three conclusions.

*Conclusion 1.* NHC lacked cause to terminate the management agreement under Section 17.1, the first with-cause termination provision, because WPI cured its breaching activity within thirty days of receiving NHC's notice of default. "[T]he last time WPI shared the Westin's information with Pizzuti was in April 2017, and WPI terminated its Consulting Agreement with

---

[3] Wischermann and WPI claim the "economic loss doctrine" bars NHC's breach-of-fiduciary-duty counterclaim. We note, however, that so far the Tennessee Supreme Court has applied this doctrine only in "the products liability context" and to some varieties of fraud claims. *Milan Supply Chain Sols., Inc. v. Navister, Inc.*, 627 S.W.3d 125, 153–54 (Tenn. 2021).

Pizzuti . . . on May 16, 2017." *Wischermann Partners, Inc.*, 2021 WL 809683, at \*5. These efforts took place within thirty days of Wischermann's receiving NHC's default notice, so "NHC did not have cause to terminate under Section 17.1." *Id.*

*Conclusion 2.* Just as NHC lacked cause to terminate under Section 17.1, it lacked cause to terminate under Section 17.2. Termination under Section 17.2 is appropriate only if a party breaches a "material" provision of the management agreement or "a sufficient number of non-material provisions." And according to the district court, the provisions allegedly breached by Wischermann and WPI (confidentiality and non-compete) were immaterial to the management agreement.[4] The body of the district court's opinion offered but one reason for this conclusion: "[T]here is no indication within the four corners of the Management Agreement that the parties intended the non-compete or confidentiality provisions to be material," and "[i]f the parties did view these provisions as material, they could have included provisions to that effect in the agreement."[5] *Id.*

*Conclusion 3.* Because NHC lacked cause to terminate under Sections 17.1 and 17.2, the only remaining avenue for termination was Section 17.3. But Section 17.3 requires payment of a termination fee, and NHC paid no termination fee when it severed ties with WPI. By terminating under Section 17.3 without paying the necessary termination fee, NHC breached the management agreement and violated its contract with WPI. *Id.* at \*6.

These conclusions may ultimately prove correct. We disagree, however, with two components of the district court's reasoning.

---

[4] The district court also found that "failure to comply with [these] two non-material provisions" was insufficient for with-cause termination. *Id.*

[5] In a footnote—almost as an aside—the district court also noted how "NHC wait[ed] four months" after learning of Wischermann's alleged disloyalty to send the April 27 default notice. *Id.* at \*5 n.2.

B

First, we disagree with the district court's "cure" analysis. Even if Wischermann and WPI prevented *future* breaches of confidentiality and non-competition when they stopped working with Pizzuti and The Joseph, more may be required to cure the damage done by years of alleged disloyalty.

To cure a breach is to "correct [a] failure to perform." *Cure of Default,* Black's Law Dictionary (11th ed. 2019). And correcting a failure to perform often requires both prospective action (preventing future wrongdoing) and retrospective action (addressing past wrongdoing). *See Correction,* Black's Law Dictionary (11th ed. 2019) (defining "correction" as "making right what is wrong"). Stated differently, the right to cure sometimes requires a breaching party to both abstain from future breaching activity and also to undo or diminish the consequences of its prior failure(s) to perform.

Several cases from the Tennessee Court of Appeals support the idea that merely preventing future wrongdoing is sometimes insufficient to cure prior breaches of contract. *See*, *e.g.*, *Manor Homes, LLC v. Ashby Cmtys., LLC*, No. M2017-01369-COA-R3-CV, 2018 WL 3814981, at \*12 (Tenn. Ct. App. Aug. 10, 2018) ("The reason for [affording a reasonable opportunity to cure] is to encourage contracting parties to settle their disputes and avoid litigation by allowing the defaulting party the chance *to repair defective work*, reduce damages, *and avoid additional problems*." (emphasis added)); *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 229 (Tenn. Ct. App. 2009) (same); *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990) (explaining how a breaching party cures by "avoid[ing] additional defective performance" and by "correct[ing] its defective work"). In some instances, a breaching party must do more than stem the bleeding; it must work to correct the damage already done.

This is one of those instances. In this case, avoiding future wrongdoing was insufficient, on its own, to cure Wischermann's alleged breaches of the confidentiality and non-compete provisions. To successfully exercise the right to cure—and to thereby proscribe termination under Section 17.1—Wischermann and WPI must have also "correct[ed] [their] defective work," *McClain*, 806 S.W.3d at 198, and righted their alleged wrongdoing. But because the district court's findings of fact never discussed what efforts (if any) Wischermann and WPI made to correct their alleged breaches of confidentiality and non-competition, we cannot evaluate whether WPI properly exercised its right to cure. Nor can we evaluate whether NHC had cause to terminate the management agreement under Section 17.1. We will thus remand WPI's breach-of-contract claims for reconsideration and additional fact finding. On remand, the district court should evaluate whether Wischermann and WPI expended any effort to cure their alleged <u>prior</u> breaches of confidentiality and non-competition, and, if so, whether those efforts "corrected" or "made right" their breaching activity.

C

We also disagree with the district court's Section 17.2 reasoning. The management agreement might not expressly label the confidentiality and non-compete provisions as "material," but materiality does not turn on a single factor or consideration.

Rather than focusing on formalism or labels, Tennessee courts apply a litany of factors to separate material breaches from immaterial breaches. *State v. Howington*, 907 S.W.2d 403, 410–11 (Tenn. 1995). Those factors include "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood

that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Id.* (quoting Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981)); *Forrest Constr.*, 337 S.W.3d at 225–26.

The district court never mentioned or applied any of these factors in its findings of fact and conclusions of law. Instead, the district court appears to have relied on the mistaken assumption that a contract provision is only material if the parties formally label it as material. Given the centrality of this legal error to the district court's Section 17.2 reasoning, we must again remand for reconsideration. On remand, the court may also consider whether the cure analysis for Section 17.1 also applies under Section 17.2.

III

For the reasons explained above, we **VACATE** the judgment below and **REMAND** for further proceedings consistent with this opinion.