# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 4, 2016 Session

## RAM TOOL & SUPPLY COMPANY, INC. v. HD SUPPLY CONSTRUCTION SUPPLY LTD., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 13C822     Joseph P. Binkley, Jr., Judge**
_____

**No. M2013-02264-COA-R3-CV – Filed July 21, 2016**
_____

A construction tools and materials distribution company filed a complaint against one of its former employees for unlawfully recruiting some of the plaintiff company's other employees to work for a competitor, alleging breach of fiduciary duty/duty of loyalty. The plaintiff company also named as defendants the competing company and one of the competitor's employees, asserting these defendants aided and abetted its employee's breach of fiduciary duty/duty of loyalty. The plaintiff company further alleged all the defendants were liable for engaging in a civil conspiracy. All parties moved for summary judgment, and the trial court granted the defendants' motions on the basis that the plaintiff company's claims were preempted by the Tennessee Uniform Trade Secrets Act ("TUTSA"). On appeal, we hold that the plaintiff company asserted viable claims against the defendants that do not depend on the company's trade secrets and are, therefore, not preempted by TUTSA. The trial court's judgment dismissing the plaintiff company's claims for breach of fiduciary duty/duty of loyalty, aiding and abetting, and civil conspiracy is reversed, and the case is remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Joseph R. Welborn, III, and Jason W. Callen, Nashville, Tennessee, for the appellant, Ram Tool and Supply Co., Inc.

Thor Y. Urness, Edmund S. Sauer, and Kristi Wilcox Arth, Nashville, Tennessee, and John W. Smith T, Birmingham, Alabama, for the appellees, White Cap Construction Supply and Robert Maples.

Elizabeth G. Hart and Tara L. Swafford, Franklin, Tennessee; and William S. Rutchow and Jennifer S. Rusie, Nashville, Tennessee, for the appellee Tim Pruitt.

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ram Tool & Supply Company, Inc. ("Ram Tool") and HD Supply Construction Supply, Ltd., d/b/a White Cap Construction Supply ("White Cap") are competitors in the construction tools and materials distribution industry. Ram Tool has headquarters in Birmingham and has branches in other southern cities, including Nashville. White Cap has headquarters in Atlanta and has branches in other parts of the country, but it did not open a branch in Nashville until 2011. Ram Tool alleges that in 2010, Robert Maples, a White Cap employee and recruiter, contacted Tim Pruitt, a Ram Tool employee, about the possibility of working for White Cap if it opened a branch in Nashville. Ram Tool asserts that Mr. Pruitt was a manager and long-term employee of Ram Tool's Nashville office and was one of its top producing salesmen. According to Ram Tool, Mr. Pruitt breached his fiduciary obligations to Ram Tool by orchestrating and engaging in the solicitation and recruitment of several Ram Tool employees on behalf of White Cap while he was still employed by Ram Tool, causing Ram Tool to suffer damages. Ram Tool asserts that Mr. Maples and White Cap assisted, encouraged, induced, and instructed Mr. Pruitt in his recruitment and solicitation efforts.

Ram Tool first filed a complaint against Mr. Maples, Mr. Pruitt, and other former employees in March 2011, which it later amended. In its fourth amended complaint, Ram Tool named three defendants: White Cap, Mr. Maples, and Mr. Pruitt (together, the "Defendants"). Ram Tool asserted claims for breach of fiduciary duty/duty of loyalty; aiding and abetting the breach; intentional interference with business relations; and civil conspiracy. Ram Tool sought compensatory and punitive damages up to $12,000,000 in addition to its costs and attorneys' fees. Ram Tool filed a motion for partial summary judgment in July 2013 with respect to its claims for breach of fiduciary duty/duty of loyalty, aiding and abetting, and conspiracy. White Cap and Mr. Maples filed a motion for summary judgment with respect to all of Ram Tool's causes of action. Mr. Pruitt filed a separate motion for summary judgment with respect to Ram Tool's claims against him for breach of fiduciary duty, intentional interference with business relations, and conspiracy.

### Trial Court Ruling

The trial court granted the Defendants' motions for summary judgment on September 9, 2013. The court wrote, in pertinent part:

> 9. Now, even though the complaint alleges breach of fiduciary duty
> of loyalty to the employer, tortious interference with business relationships,
> conspiracy, and aiding and abetting, the underlying facts and allegations,

2

including the plaintiff's extensive evidentiary submissions in connection with its own motion for partial summary judgment, demonstrate that the plaintiff's common law claims depend on proof that trade secret, proprietary and/or confidential information - all of which are synonymous under Tennessee case law - was acquired, disclosed and/or used by the defendants. The plaintiff elected to abandon its TUTSA [Tennessee Uniform Trade Secrets Act] claim as a basis for its lawsuit, even though the information that forms the basis for the plaintiff's claims, if proved, would qualify for protection under TUTSA. This information includes the schedules by which the sales commissions were calculated, the lists of customers on whom the individuals who left Ram Tool and went to White Cap to work called, and the amounts of sales made by those individuals to those customers when those salespeople were working for Ram Tool.

10. Therefore, summary judgment is granted to all defendants based upon preemption by TUTSA.

11. Even assuming that TUTSA does not preempt all of the plaintiff's claims, then summary judgment is granted on the plaintiff's claim of tortious interference with the plaintiff's employment relationships with defendant Tim Pruitt and the plaintiff's other former sales representatives who left with Tim Pruitt. The basis for this ruling is the language of *FTA Enterprises, Inc. v. Pomeroy Computer Resources, Inc.*, No. E200001246-COA-R3-CV, 2001 WL 185210 (Tenn. Ct. App. Feb. 12, 2001), which is not a reported case but a case that the Court finds persuasive. The Tennessee Court of Appeals stated in that case that, "[t]here are no cases in Tennessee recognizing the employer's cause of action for this tort [*i.e.*, intentional interference with an at-will employment relationship between the employer and its employee]," 2001 WL 185210, at *5, and "we conclude that this tort does not run in favor of the employer." *Id.*

12. To the extent the plaintiff's tortious interference with business relationships claim is based on alleged customer relationships, the plaintiff has made clear that any such claim derives entirely from the alleged interference with the plaintiff's employment relationships with its former sales representatives. That is, the plaintiff claims that by hiring away the plaintiff's sales representatives, the defendants were subsequently able to solicit and make sales to - *i.e.*, interfere with - the plaintiff's customers serviced by such salesmen. Because the Court has already found that the plaintiff has no claim based on interference with its employee relationships, it necessarily follows that the plaintiff has no derivative claim based on the same alleged conduct. The plaintiff's other claims deriving from alleged tortious interference, which are the claims of aiding and abetting and

3

conspiracy, fail since such claims cannot survive if the underlying claim itself does not constitute an actionable tort. . . . Accordingly, the Court believes that summary judgment should also be, and hereby is, granted as to the plaintiff's tortious interference with business relationship claims (and any such derivative claims) against the defendants.

. . .

16. In addition, if TUTSA preemption is deemed not to apply to the plaintiff's non-interference claims (*i.e.*, breach of duty of loyalty claim and its derivative claims of aiding and abetting and conspiracy), the Court finds there are genuine issues of material fact, justifying denial of the plaintiff's motion for partial summary judgment and the defendants' motions for summary judgment as to such non-interference claims.

Previous Court of Appeals Ruling

Ram Tool appealed the trial court's award of summary judgment to the Defendants.[1] In an opinion containing a thorough recitation of the facts taken from the parties' statements of material facts in support of their respective motions for summary judgment, the Court of Appeals affirmed in part and reversed in part the trial court's judgment. *See Ram Tool & Supply Co., Inc. v. HD Supply Constr. Supply Ltd.*, M2013-02264-COA-R3-CV, 2014 WL 4102418 (Tenn. Ct. App. Aug. 19, 2014). The Court explained why Ram Tool's common law breach of fiduciary duty/loyalty claims, and the derivative claims, are preempted by TUTSA to the extent they are based on the misappropriation of trade secrets. *Id.* at *11-16. The Court continued, however, that Ram Tool's common law breach of fiduciary duty/loyalty claim as well as its derivative claims that are not based on the misappropriation of trade secrets are not preempted by TUTSA. *Id.* at *17. With regard to the claims that are not preempted by TUTSA, the Court found the existence of genuine issues of material fact:

> [F]actual disputes abound in this case, specifically with regard to the defendants' alternative theories for summary judgment. For example, as relevant to the duty determination, a dispute exists as to Tim Pruitt's position within Ram Tool, particularly whether he possessed any managerial responsibility. Similarly, disputes exist with regard to whether a breach occurred; the parties dispute Tim Pruitt's conduct, the timing of such conduct, and the effect, if any, of such conduct. Moreover, even if White Cap and Maples are correct that the only unlawful purpose thus far alleged by Ram Tool concerns misappropriation, for the reasons stated above, the failure, at this juncture, to set forth an unlawful purpose untied to misappropriation does not render summary judgment appropriate under *Hannan*. Because genuine disputes of material fact exist and because

---

[1]Despite the language of its judgment in paragraph 16, the trial court dismissed all of Ram Tool's claims.

4

White Cap and Maples have merely challenged Ram Tool to "put up or shut up" with regard to the conspiracy claim, summary judgment is inappropriate on the alternative grounds espoused by the defendants.

*Id.* at \*18. Thus, the Court concluded that the trial court erred in granting summary judgment to the Defendants on Ram Tool's common law breach of fiduciary duty/loyalty claim and its derivative claims to the extent they are not based on the misappropriation of trade secrets. *Id.*

Supreme Court's Remand

The Defendants filed a Rule 11 application for permission to appeal to the Tennessee Supreme Court. The Supreme Court granted the petition for the purpose of remanding the case to the Court of Appeals for reconsideration in light of the case *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015).

II. ANALYSIS

A. Standard of Review

Whether a party is entitled to summary judgment is a matter of law, which means that we review the trial court's judgment de novo, according the trial court's decision no presumption of correctness. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). When the Court of Appeals first considered Ram Tool's appeal of the trial court's grant of summary judgment, the standard for determining whether summary judgment was appropriate was set forth in *Hannan v. Alltel Publishing Company*, 270 S.W.3d 1, 8-10 (Tenn. 2008). The summary judgment standard has changed since that time, however, and now the standard for determining whether a party is entitled to summary judgment in Tennessee is the same as the federal standard. *See Rye*, 477 S.W.3d at 250-65; *see Hamer v. Se. Res. Grp.*, M2015-00643-COA-R3-CV, 2016 WL 853020, at \*3 n.4 (Tenn. Ct. App. Mar. 3, 2016) (noting that summary judgment standard the Supreme Court articulated in *Rye* applies retroactively). As the *Rye* Court explained:

> Our overruling of *Hannan* means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which

5

the moving party contends there is no genuine issue for trial." TENN. R. CIV. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye*, 477 S.W.3d at 264-65.

In determining whether a party is entitled to summary judgment, we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Martin*, 271 S.W.3d at 84 (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)). A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

Ram Tool does not dispute the trial court's determination that its claims based on the misappropriation of trade secrets are preempted by TUTSA or the trial court's dismissal of Ram Tool's claim for intentional interference with business relations. Thus, the only claims currently at issue against Mr. Pruitt are Ram Tool's claims for breach of fiduciary duty/duty of loyalty and conspiracy, to the extent these claims are not based on the misappropriation of Ram Tool's trade secrets. The only claims still at issue against White Cap and Mr. Maples are Ram Tool's claims for aiding and abetting Mr. Pruitt's breach of his fiduciary duty/duty of loyalty to Ram Tool and conspiracy. To determine whether any of the parties are entitled to summary judgment with regard to these claims, we must review Ram Tool's fourth amended complaint, the statements of material facts each party submitted in connection with the motions for summary judgment, and the responses.

B.  Breach of Fiduciary Duty and/or Duty of Loyalty

The parties agree that Mr. Pruitt as well as the employees he allegedly solicited to leave Ram Tool were all employees at will and were not subject to non-compete agreements.  The law in Tennessee, however, is that all employees owe their employer a duty of loyalty, regardless of whether they are at-will employees or have employment contracts:

> During the employment relationship, an employee has a fiduciary duty of loyalty to the employer. The employee must act solely for the benefit of the employer in matters within the scope of his employment. The employee must not engage in conduct that is adverse to the employer's interests.

*Knott's Wholesale Foods, Inc. v. Azbell*, No. 01A-01-9510-CH-00459, 1996 WL 697943, at *3 (Tenn. Ct. App. Dec. 6, 1996) (citing 27 AM. JUR. 2D *Employment Relationship* § 216) (quoted with approval by *Efird, III v. Clinic of Plastic & Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 219 (Tenn. Ct. App. 2004)).  The employee in *Azbell* was an at-will employee, like Mr. Pruitt, and the Court of Appeals determined that the duty of loyalty imposed on him a duty not to compete with his employer "even in the absence of a noncompetition agreement." *Id.*  The Court of Appeals explained that although an at-will employee is free to end his or her employment relationship and is free to compete against his or her former employer once the relationship is terminated, an employee's duty of loyalty precludes the employee from competing against the employer during the employment relationship. *Id.* at *4.  An employee who solicits his or her coworkers to leave their jobs to work for a competitor while the soliciting employee is still being paid by the employer is in violation of his or her fiduciary duty and duty of loyalty. *See FTA Enters., Inc. v. Pomeroy Computer Res., Inc.*, E2000-01246-COA-R3-CV, 2001 WL 185210, at *4 (Tenn. Ct. App. Feb. 12, 2001); *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 964 (M.D. Tenn. 2011).

With regard to damages, an employee who breaches his or her duty of loyalty may be required to return to his or her employer any compensation he or she received while engaging in conduct adverse to his or her employer's interests. *Efird*, 147 S.W.3d at 220 (citing *Baker v. Battershell*, 1986 WL 7602, at *6 (Tenn. Ct. App. July 9, 1986)).  Moreover, the employee may have to "disgorge any profit or benefit he [or she] received as a result of his [or her] disloyal activities." *Id.*  According to the *Efird* Court, the employer need not prove it suffered a loss to recover "such illicit profits or compensation from the employee." *Id.*

Ram Tool made the following assertions, *inter alia*, in its fourth amended complaint:

> 1.  . . . Tim Pruitt intentionally, maliciously, and recklessly engaged in repeated acts of disloyalty while employed in a fiduciary capacity in Ram Tool's Nashville

branch by improperly soliciting and wrongfully hiring several Ram Tool employees for and on behalf of White Cap. White Cap and its employee and recruiter, Robert Maples, aided and abetted Pruitt in his repeated acts of disloyalty and dishonesty and repeated breaches of his fiduciary obligations by intentionally, maliciously, and recklessly encouraging and instructing him to engage in such acts, and by supporting, facilitating, and assisting him in doing so. . . .

. . .

5. White Cap targeted the Nashville branch of Ram Tool as the base from which to obtain its staff. In late July or early August of 2010, Maples contacted Pruitt about the possibility of working for White Cap if it opened a Nashville branch. At that time, Pruitt was a manager and long term employee in Ram Tool's Nashville branch, and one of its top producing salesmen. Maples told Pruitt that he would be White Cap's branch manager in Nashville and stressed that White Cap would need his help in hiring additional experienced salesmen from Ram Tool in order to open its Nashville branch. . . .

6. During the final five months of his employment at Ram Tool, beginning in early August and continuing through December 2010, Pruitt hand-picked, solicited, and recruited on White Cap's behalf four other salesmen to join him as the group that was to open White Cap's Nashville branch.

7. With complete and total disregard of his fiduciary duty to Ram Tool, Pruitt kept secret his recruiting efforts for White Cap and ultimately told Ram Tool employees that he hand-picked, solicited, and recruited to keep the secret as well. Maples asked Pruitt to identify the Ram Tool employees that he wanted to hire for White Cap's Nashville branch and Pruitt readily did so while employed by Ram Tool. Maples encouraged Pruitt to promote and sell White Cap to the Ram Tool employees and Pruitt repeatedly and readily did so while employed by Ram Tool. Maples encouraged Pruitt to solicit the Ram Tool employees to leave Ram Tool and go to work for White Cap once its physical location was set up, and Pruitt repeatedly and readily did so while employed by Ram Tool. . . . Maples requested that Pruitt put the Ram Tool employees in contact with White Cap and Pruitt did so while employed by Ram Tool. Maples asked Pruitt to set up meetings for the Ram Tool employees with White Cap representatives and Pruitt did so while employed by Ram Tool. Pruitt controlled the communications between the Ram Tool employees and White Cap. Pruitt even negotiated compensation arrangements for Ram Tool employees with White Cap all while employed by Ram Tool. . . .

8. Pruitt's repeated acts of disloyalty and dishonesty while employed by Ram Tool were done at the instruction and request of White Cap, and with White Cap's

knowledge, encouragement, support, and assistance. White Cap even went so far as to have Pruitt hire the former Ram Tool employees on behalf of White Cap while still a Ram Tool employee. On December 9 and 13, 2010, four separate employment letters were sent to Ram Tool employees offering them employment in White Cap's Nashville branch beginning January 3, 2011. The employment letters were sent with White Cap's knowledge, permission, and consent, were sent on White Cap letterhead, and were addressed from Tim Pruitt, Branch Manager of White Cap. At that time, however, Pruitt was still an employee of Ram Tool. The Ram Tool employees signed their employment letters from Pruitt and White Cap in mid-December 2010.

9. Ultimately, Pruitt and the four Ram Tool salesmen resigned from Ram Tool on December 30, 2010, and opened White Cap's Nashville branch on January 3, 2011. . . .

. . .

28. . . . [W]hile employed by Ram Tool, Pruitt pushed hard in his sales pitches to Peach, Morrissey, and Maruk and extolled the virtues and strengths of White Cap. Pruitt explained how he had worked with White Cap before, understood how it operated, and would serve as White Cap's branch manager in Nashville. He bragged about how much money he had made with White Cap and told them that they would all become millionaires if they would leave Ram Tool. Pruitt emphasized that White Cap offered good insurance policies and other benefits. In sum, Pruitt strove mightily to tempt his targets and made leaving for White Cap as attractive and appealing as possible.

. . .

45. On the final day of his employment with Ram Tool, December 30, 2010, Pruitt committed yet another act of betrayal and disloyalty before walking out the door. That day, Pruitt received an emailed purchase request from Music City Masonry, one of the regular customers he serviced while at Ram Tool. Pruitt promptly forwarded the request to Maruk with the message "first order," signifying that, despite both Pruitt and Maruk still being on Ram Tool's payroll and the customer order having been sent to him as a Ram Tool representative, Pruitt diverted the order to White Cap. Later that day, Pruitt, Maruk, Morrissey, Peach, and Mears submitted their resignations.

. . .

55. As a direct and proximate result of Defendants' unlawful and dishonest misconduct, Defendants were able to open a White Cap Nashville branch by hiring

9

away the former Ram Tool employees. Ram Tool has thereby suffered and will continue to suffer injury and loss. This includes the profits Ram Tool would have earned on sales lost as a result of Defendants' misconduct. Using unlawfully solicited and wrongfully hired Ram Tool employees, White Cap made and continues to make sales in the Nashville market that would have otherwise been made by Ram Tool but for Defendants' unlawful acts, including but not limited to all past and future sales made by former Ram Tool employees on White Cap's behalf and all past and future sales made by White Cap resulting from its Nashville branch. Ram Tool's losses also include the compensation it paid to Pruitt while he worked on behalf of White Cap to bring down the Nashville branch from the inside and some additional expenses Ram Tool incurred in the replacement of the former employees and retention of remaining employees.

. . .

66. . . . Defendants combined and conspired among themselves, and others, to injure Ram Tool and intentionally, maliciously, and recklessly committed acts which have produced that effect.

The allegations identified above from Ram Tool's fourth amended complaint do not involve the use of Ram Tool's "trade secrets," as that term is defined by TUTSA. *See* Tenn. Code Ann. § 47-25-1702(4) ("trade secret" is defined to include "information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan").

Turning next to the parties' statements of material facts, we find, as the Court of Appeals found in its earlier opinion, that "factual issues abound in this case." *Ram Tool*, 2014 WL 4102418, at *18. For example, White Cap and Mr. Maples included the following statement in support of their motion for summary judgment:

25. Starting in August 2010, and over a period of several months, Maples recruited Pruitt, Mears, Maruk, Peach and Morrissey. Maples did not contact McMaster until after the others had left Plaintiff.

Ram Tool disputed this statement and responded as follows:

**RESPONSE:** Disputed. From August through December 2010, Pruitt recruited the former employees with the assistance and encouragement of Maples and other White Cap employees. Pruitt admits that he recruited the former employees "aggressively and repeatedly." Pruitt was the first person these Ram Tool employees spoke with about going to White Cap and the person they talked with most. In order to get these employees to leave Ram Tool, Pruitt built up the opportunity at White Cap to make it as

10

attractive as possible.  In selling his recruits on White Cap, Pruitt told them that they would "make a million dollars," "make tons and tons of money," and "make ten times more money than you ever thought you'd make." Pruitt also told them they would have superior health and retirement benefits at White Cap and the opportunity to sell to more customers across Tennessee.  Pruitt coordinated his recruiting efforts with Maples.  Yet, Pruitt served as the point-man for Defendants' recruiting efforts and ultimately played an instrumental role in luring them away to White Cap. For example, none of the employees recruited by Pruitt ever went through any type of formal interview or application process with White Cap. Indeed, with the exception of one later recruit, none of the salesmen recruited by Defendants provided a resume, employment history, or even filled out an application before hiring.  Instead, Pruitt provided much of the critical information regarding each candidate to Maples directly, all while Pruitt was an employee of Ram Tool.  As a result, in a personnel evaluation prepared after Pruitt joined White Cap, his White Cap superior, Craig McCurdy, praised Pruitt for his efforts, stating:

> *Tim was instrumental in recruiting the talent in the Nashville market.*  With his help we have hired 4 account managers from our competition & built one of the strongest inside support teams in the Region.

Finally, although Maples may not have contacted McMaster until after Pruitt's other recruits had left Ram Tool, Pruitt began recruiting McMaster before Pruitt left Ram Tool.[2]

We agree with Ram Tool that the record contains evidence sufficient to support its contention that Mr. Pruitt unlawfully recruited Ram Tool's employees through means other than the use of Ram Tool's trade secrets or confidential information.  Ram Tool's claims against Mr. Pruitt, therefore, are not preempted by TUTSA so long as Ram Tool does not rely on proof at trial that implicates Ram Tool's trade secrets and/or confidential information.

## C. Aiding and Abetting Breach of Fiduciary Duty/Duty of Loyalty

Next we consider whether Ram Tool can proceed on its claim against Mr. Maples and White Cap for aiding and abetting Mr. Pruitt in breaching his fiduciary duty/duty of loyalty.  Tennessee recognizes a "common law civil liability theory of aiding and abetting," which requires Ram Tool to prove that Mr. Maples and/or White Cap "knew that [Mr. Pruitt']s conduct constituted a breach of duty, and that [the Defendant/s] gave

---

[2]Ram Tool included in its response numerous supporting references to depositions, which we omit here.

substantial assistance or encouragement to [him] in [his] acts." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp*., 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012) (quoting *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997)) (further citation omitted); *see also Stein Holdings, Inc. v. Goense Bounds Mgmt., LP*, W2012-01954-COA-R3-CV, 2013 WL 5436372, at *2-3 (Tenn. Ct. App. Sept. 27, 2013) (recognizing civil liability for aiding and abetting tortious conduct). According to the Restatement (First) of Torts § 876 (1939 & June 2016 Supp.):

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he:
>
> (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*See PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship*, 387 S.W.3d at 552 (citing Restatement (First) of Torts § 876 with approval).

A review of the allegations Ram Tool set forth in its fourth amended complaint convinces us that it stated a claim against Mr. Maples and/or White Cap for aiding and abetting Mr. Pruitt's breach of his fiduciary duty/duty of loyalty. For example, in paragraph 53, Ram Tool asserts:

> Pruitt's repeated acts of disloyalty and dishonesty while employed by Ram Tool were done at the instruction and request of White Cap, and with White Cap's knowledge, encouragement, support, and assistance. White Cap even went so far as to have Pruitt hire the former Ram Tool employees on behalf of White Cap while still a Ram Tool employee.

In their statement of undisputed material facts, the Defendants stated:

> 28. The Plaintiff has identified no proof that White Cap or Maples requested, solicited, or otherwise encouraged Pruitt to act disloyally.

Ram Tool disputed this statement, however, and responded, in part, as follows:

> **RESPONSE**: Disputed. . . . Maples encouraged and assisted Pruitt in Pruitt's recruitment and solicitation of Ram Tool employees, which was in violation of Pruitt's fiduciary duty and duty of loyalty that he owed Ram

12

Tool as a manager and employee of the company. Pruitt coordinated his recruiting efforts with Maples.

. . .

The offer letters [White Cap] sent to Morrissey, Peach, Maruk, and Mears in December 2010 were also sent under Pruitt's name as branch manager or White Cap's Nashville branch. At the time these letters were sent and received, Pruitt was a Ram Tool employee and masonry division sales manager. Maples instructed the White Cap employees who sent the letters to use Tim Pruitt's name. Indeed, Maples admits that he and Pruitt worked together to establish the White Cap Nashville branch while Pruitt was employed by Ram Tool.

This is despite the fact that Maples concedes that he knew that an employee cannot recruit against his own company. Maples also testified that he in fact knew that an employee cannot recruit against his own company, *i.e.*, Maples and therefore White Cap knew that Pruitt was strictly prohibited from recruiting Ram Tool employees on White Cap's behalf. Paul Radomski, White Cap's regional vice-president, similarly testified that recruiting against your employer would be "unethical" and that if Pruitt did it against Ram Tool, it would be wrong. This testimony is consistent with White Cap's own personnel policies, which prohibit recruiting and soliciting fellow employees to work for a competitor.[3]

Ram Tool's aiding and abetting claim does not appear to be based on the disclosure or use of its trade secrets; therefore, it is not preempted by TUTSA. We hold that Mr. Pruitt, Mr. Maples, and White Cap have each failed to negate affirmatively an essential element of Ram Tool's breach of fiduciary duty/duty of loyalty claim or its aiding and abetting claim, and they have failed to demonstrate that Ram Tool's evidence is insufficient to establish either of these claims, as they must to prevail on their motion for summary judgment. *Rye*, 477 S.W.3d at 264. As a result, we hold that Mr. Pruitt is not entitled to summary judgment on Ram Tool's breach of fiduciary duty/duty of loyalty claim and that Mr. Maples and White Cap are not entitled to summary judgment on Ram Tool's aiding and abetting claim.

D. Civil Conspiracy

A civil conspiracy is defined as:

"a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful

---

[3]Ram Tool cited various portions of supporting deposition transcripts, which we omit here.

purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff."

*Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002)). The elements of a civil conspiracy include "'common design, concert of action, and an overt act.'" *Azbell*, 1996 WL 697943, at *5 (quoting *Kirksey v. Overton Pub, Inc.*, 739 S.W.2d 230, 236 (Tenn. Ct. App. 1987)). To be actionable, the defendant/s must be liable for an underlying tort that was committed pursuant to the conspiracy. *Lane*, 334 S.W.3d at 763 (citing *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)). There must be a concerted effort by the defendants to cause harm to the plaintiff, and the plaintiff must, in fact, suffer harm as a result of the defendants' efforts. *Azbell*, 1996 WL 697943, at *5 (citing *Kirksey*, 739 S.W.2d at 236).

In addition to the allegations quoted above in support of this cause of action, Ram Tool asserted the following in its fourth amended complaint:

1. . . . Defendants' intent was to wrongfully cripple if not destroy altogether Ram Tool's Nashville branch.

. . .

9. . . . After Defendants had engaged in the intentional, malicious, and reckless misconduct described above, they gleefully celebrated in emails as they danced over the grave they believed they had dug for Ram Tool. Yet still not satisfied, White Cap hired another top Ram Tool salesman within two weeks of its Nashville branch opening, and like the others, this employee had been solicited by Pruitt prior to his resignation as an employee of Ram Tool. When requesting permission to hire this employee, Maples emphasized that the hiring would be the final nail in Ram Tool's coffin built by Defendants.

. . .

18. Having no . . . outside or inside salesmen in the area, White Cap cast a covetous eye toward Ram Tool's Nashville-branch employees. Yet rather than recruit and compete fairly for their services, White Cap conspired with one of Ram Tool's managers, Tim Pruitt, to solicit from the inside of Ram Tool's branch the workforce White Cap needed to open a Nashville office. In so doing, White Cap embarked on a strategy designed to disrupt and cripple its major competitor so that White Cap's new branch could be staffed and take over the all-important Nashville market.

14

19.  . . .  After hearing of White Cap's interest, Pruitt readily agreed to begin working from the inside of Ram Tool's branch to build a competing office, while still employed by and serving as a manager for Ram Tool.

20.  Pruitt and Maples then embarked on a strategy to solicit key Ram Tool sales representatives to leave Ram Tool and join White Cap. . . .

. . .

25.  . . .  Maples had numerous conversations with Pruitt about White Cap and the individuals they targeted.  With Maples' encouragement and assistance, Pruitt repeatedly over a five-month span promoted White Cap and attempted to sell his fellow employees on leaving Ram Tool, all while Pruitt was employed by Ram Tool. . . .

. . .

46.  [On their final day with Ram Tool], Pruitt, Maples, and White Cap were celebrating the destruction they had wrought on Ram Tool.  In an email sent that day from Radomski to White Cap and HD Supply's senior management team and Maples, Radomski reveled in the success of White Cap's strategy to destroy Ram Tool from the inside of its Nashville branch: "We [White Cap] dropped the bomb on RAM TOOL in Nashville yesterday.  All 5 candidates walked in and resigned.  They all start on Monday.  . . .  RAM TOOL was caught completely off guard."

47.  Hoping to administer a final coup de grace to Ram Tool, Maples immediately emailed his superiors that same day asking for permission to hire McMaster, stating:  "Also this would put a final DAGGER in our competition.  (Just say when) and I'll make this happen!"

. . .

53.  With the assistance, encouragement, and instruction of White Cap and Maples, Pruitt intentionally, maliciously, and recklessly breached his fiduciary duties and obligations to Ram Tool by, among other things, orchestrating and engaging in the solicitation and recruitment of several Ram Tool employees for White Cap, including Morrissey, Peach, Maruk, Mears, and McMaster, all while Pruitt was employed by Ram Tool.  Pruitt personally and repeatedly solicited and recruited his fellow Ram Tool employees on behalf of White Cap in direct violation of his fiduciary duties.  Pruitt also put Maples and White Cap in touch with these employees and, as detailed above, acted as their primary point of contact with White Cap.

54. In each and every one of his breaches, Pruitt was assisted, encouraged, induced, and instructed by White Cap and Maples. In short, White Cap and Maples acted in concert with Pruitt in all of the misconduct identified above. . . .

Ram Tool's fourth amended complaint sets forth a claim for civil conspiracy among the Defendants, and the allegations recited above do not rely on Ram Tool's trade secrets in so doing. The parties' discovery reveals that there are genuine issues of material fact with regard to whether or not Mr. Maples and White Cap conspired with Mr. Pruitt, as Ram Tool alleges. For example, despite the Defendants arguments that they did nothing wrong, Mr. Maples testified as follows during a deposition when he was shown a letter from White Cap, on White Cap's letterhead, offering a Ram Tool employee a job:

Q:     The letter in front of you, Exhibit 1 to Mr. Mears, can you tell me the date of that?

A:     That says 12-13-2010.

Q:     And can you tell me, to your knowledge, on 12-13-2010, where did Tim Pruitt work?

A:     He was an employee of Ram Tool.

. . .

Q:     Who is that letter from?

A:     It states Tim Pruitt.

Q:     What is his title under his name?

A:     Branch Manager I.

Q:     Is that document presented on White Cap letterhead?

A:     Yes.

Q:     Did you authorize the using of Mr. Pruitt's name on that letter?

A:     Yes.

Q:     Was he being paid by White Cap at that time?

A:     No.

Q:     Did you let him know you were using his name to make offers from White Cap?

16

A:      No, I don't believe so, no.

Q:      Do you often use other people's names to do your job?

. . .

A:      No, and didn't think much of it since these candidates would be eventually reporting up to him.  So we wanted to get everything right in the system.  So that was the nature of, you know . . .

We are convinced by the record in this case that Ram Tool has stated a claim for civil conspiracy against the Defendants and that its claim is not preempted by TUTSA. As with Ram Tool's other claims discussed above, the Defendants have failed to negate affirmatively an essential element of Ram Tool's civil conspiracy claim or demonstrate that Ram Tool's evidence is insufficient to establish this claim, as they must to prevail on their motion for summary judgment.  *Rye*, 477 S.W.3d at 264.  As a result, we hold that the Defendants are not entitled to summary judgment on Ram Tool's civil conspiracy claim.

### III. Conclusion

The trial court's judgment awarding the Defendants summary judgment is reversed with regard to Ram Tool's claim against Mr. Pruitt for breach of fiduciary duty/duty of loyalty; its claim against Mr. Maples and White Cap for aiding and abetting Mr. Pruitt's breach; and its claim against all the Defendants for civil conspiracy.  The case is remanded to the trial court for further proceedings consistent with this opinion. The costs of this appeal shall be taxed to the Defendants, HD Supply Construction Supply, Ltd., d/b/a White Cap Construction Supply, Robert Maples, and Tim Pruitt, for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE